IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| E.R.K., by his legal guardian R.K., R.T.D., through his parents R.D. and M.D.; HAWAI`I DISABILITY RIGHTS CENTER, in a representative capacity on behalf of its clients and all others similarly situated, <br><br>        Plaintiffs, <br><br>   vs. <br><br> DEPARTMENT OF EDUCATION, State of Hawai`i, <br><br>        Defendant. | Case No. 10-00436 SOM-KSC <br><br> **MEMORANDUM IN SUPPORT OF MOTION** |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................1

II.    CIVIL CONTEMPT STANDARD ................................................4

III.   FACTS DEMONSTRATING THE DOE'S CONTEMPT ...........................5

       A.     The August 2014 Order ........................................................5

       B.     The DOE Has Failed to Provide or Even Plan for Services .................6

       C.     The DOE Is Requiring Every Class Member to Prove a Right to
              Compensatory Education and, as a Result, Refused
              Compensatory Education to Nearly 85% of the Pilot Group ...............8

       D.     The DOE's Efforts Are Primarily Devoted to Shrinking the
              Number of Class Members Who Can Receive Services ....................10

       E.     The DOE Is Not Attempting to Serve Even the Undisputed
              Class Members .................................................................13

       F.     The DOE Is Hindering Contact with the Class ...................................14

       G.     The DOE Is Either Mismanaging Its Public Resources or
              Manipulating Its Reporting of Money Being Spent ..........................16

IV.    THE DOE IS VIOLATING THE COURT'S AUGUST 2014 ORDER .......17

V.     REMEDY FOR CONTEMPT ....................................................20

       A.     A Special Master Is Appropriate to Manage the Complex
              Remedial Issues the DOE Has Not Yet Addressed ..........................20

       B.     The Court Should Appoint a Special Master Here ............................22

              1.     Duties of the Special Master ....................................23

              2.     Compensation of the Special Master ........................24

       C.     Attorneys' Fees .................................................................24

VI.    CONCLUSION .........................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aspira of N.Y. Inc. v. Bd. of Educ. of N.Y.*,
    423 F. Supp. 647 (S.D.N.Y. 1976) ....................................................................19

*Blackman v. District of Columbia*,
    185 F.R.D. 4 (D.D.C. 1999) ......................................................................21, 22

*Cruz v. Hauck*,
    515 F.2d 322 (5th Cir. 1975) ............................................................................20

*In re Crystal Palace Gambling Hall, Inc.*,
    817 F.2d 1361 (9th Cir. 1987) (per curiam) ..............................................4, 5, 16

*Duane B. v. Chester-Upland Sch. Dist.*,
    No. Civ. A. 90-0326, 1994 WL 724991 (E.D. Pa. Dec. 29, 1994) ....4, 18, 19, 22

*Frederick L. v. Thomas*,
    557 F.2d 373 (3d Cir. 1977) .............................................................................21

*Friendship Edison Charter Sch. Collegiate Campus v. Nesbitt*,
    583 F. Supp. 2d 169 (D.D.C. 2008) ..................................................................24

*In re Himmelfarb*,
Civ. No. 14-00352 SOM/RLP,
    2015 WL 400617 (D. Haw. Jan. 28, 2015).........................................................24

*Ins. of Cetacean Res. v. Sea Shepherd Conservation Soc'y*,
    774 F.3d 935 (9th Cir. 2014) .............................................................................4

*John B. v. Menke*,
    176 F. Supp. 2d 786 (M.D. Tenn. 2001) ...........................................................22

*Jose P. v. Ambach*,
    669 F.2d 865 (2d Cir. 1982) ......................................................................21, 22

*Murphy ex rel. Murphy v. Timberlane Reg. Sch. Dist.*,
    855 F. Supp. 498 (D.N.H. 1994).......................................................................19

*John T. ex rel. Paul T. v. Del. Cnty. Inter. Unit*,
    No. Civ. A 98-5781, 2003 WL 22006810 (E.D. Pa. Aug. 22, 2003) .................24

*Penn. Ass'n for Retarded Children v. Com. of Pa.*,
    343 F. Supp. 279 (E.D. Pa. 1972) .......................................................................22

*Perry v. O'Donnell*,
    759 F.2d 702 (9th Cir. 1985) .........................................................................5, 24

*Petties v. District of Columbia*,
    538 F. Supp. 2d 88 (D.D.C. 2008).....................................................................22

*Reed v. Cleveland Bd. of Educ.*,
    607 F.2d 737 (6th Cir. 1979) .............................................................................20

*United States v. United Mine Workers*,
    330 U.S. 258 (1947)............................................................................................19

## Statutes

HRS § 92-F ...............................................................................................................3, 14

## Other Authorities

34 C.F.R § 99.31 ........................................................................................................15

45 C.F.R. §164.512 ....................................................................................................15

Fed. R. Civ. Proc. 53 ..................................................................................................20

## MEMORANDUM IN SUPPORT OF MOTION

## I.    INTRODUCTION

The DOE's actions in this case demonstrate contempt for the Court's August 2014 order in every sense of the word.  It is, indisputably, the DOE's responsibility to provide the compensatory services the Court granted to the older Class Members some 17 months ago.  Indeed, the DOE even claimed to the House Finance Committee in January that it was already doing so.  Decl. Michelle N. Comeau ("Comeau Decl.") Ex. 1.  But that is not true.  The DOE has admitted it has no concrete plans to provide services for the older Class Members or any dedicated resources for those services.  Ex. 2 at 196:25-197:6.  The DOE has not budgeted to provide any compensatory services.  *Id*. at 147:10-148:15, 154:18-157:4, 197:7-14.  The DOE has not contacted a single service provider.  *Id*. at 187:4-13. The DOE has identified no facilities or staff that are ready or even planned to provide compensatory education.  *Id*. at 189:12-16, 194:19-195:9.

Worse, the DOE has made clear that it has no intention of providing the relief ordered.  This Court has *already held* that the Class Members are entitled to compensatory education because Plaintiffs had established a specific loss of educational opportunity for all Class Members, yet the DOE continues to insist that every Class Member must prove he or she was injured because of the loss of services and is entitled to compensatory education.  The DOE claims this standard

of proof is appropriate because the Court's August 2014 order is wrong and not a proper remedy for this Class. *See, e.g.,* Ex. 9 at 5-6. When the DOE applied its standard to the pilot group of 18 Class Members assessed last summer, it reached the appalling conclusion that 85% of the disabled young adults assessed were entitled to **no compensatory education**. Why? Because, the DOE wrote over and over in their reports, each of these individuals would not have learned anything if they received another two years of schooling, and so were not harmed by the DOE's failure to provide them with this education. *See* Comeau Decl. ¶ 6 & Ex. 3.

For the 400+ Class Members that have been found and have come forward as interested, the DOE's belated response has been to argue that two-thirds of them are not Class Members at all, even though they were contacted months earlier based on the DOE's own listing of names. Even for those whom the DOE does not dispute are eligible, the DOE has still failed to offer them any services. In response to Plaintiffs' call for services to this group, the DOE issued an extensive listing of requests for information, documentation, and permissions to be produced by each Class Member before the DOE was willing to take any steps toward offering services. *See* Ex. 4; Ex. 6 at 197-98.

Finally, the DOE has delayed and is now actively resisting efforts to reach the two-thirds (1,175/1,800) of Class Members who have not yet been reached and so are likely unaware of the remedy they have won. Reaching these

Class Members is a significant issue in this case, as the DOE has readily

acknowledged.  As Kathryn Matayoshi explained to the legislature, the older Class

Members are adults who may or may not be at the same address they maintained in

high school.  *See* Ex. 1.  Newspaper notices and direct mail were of little utility in

reaching the disabled class members, and direct calls from a third party call center

proved greatly limited by the lack of updated contact information.

Many of these Class Members receive current services from other

state agencies such as the Department of Vocational Rehabilitation, Med-QUEST,

and the Developmental Disabilities Division of the Department of Health—and the

DOE has a statutory right of access to all of these files under HRS § 92-F.  Yet the

DOE has refused to seek current contact information from other agencies, and

instead requested Judge Chang rule that the Class be "closed" as of November 30,

2015—meaning those individuals who had not been reached by then have no right

to any compensatory education even if they are found.  When Plaintiffs' counsel

sought to reach incarcerated Class Members—in the custody of the State—the

DOE had this effort shut down.  *See* ECF No. 293-24.

There are 1,800 people on the DOE's list who are now between 22

and 27 years old.  They were excluded from attending school between 2010 and

2014 through no fault of their own, and the DOE's unfortunate determination to

treat this case as a war of attrition into its sixth year is only causing them further

harm.  The hundreds of Class Members who have signed up for services continue to wait as the parties have attended status conference after status conference, while the DOE remains largely unresponsive to Plaintiffs' and Judge Chang's efforts to move the DOE toward actually providing those services.  This falls well below the DOE's obligations to avoid a finding of contempt.  It is also is plainly contrary to the intent of the IDEA, which stands for the principle that excluding disabled citizens from educational services is a false economy unbefitting our society.  The Ninth Circuit already had to explain this point once to the DOE, 728 F.3d at 992, and Plaintiffs now ask this Court to explain it again.

Plaintiffs therefore request an order adjudging the Department of Education to be in civil contempt of this Court's August 22, 2014, Order.  Plaintiffs seek appointment of a special master to remedy this ongoing contempt.

## II.    CIVIL CONTEMPT STANDARD

A party that has violated a specific and definite order of the Court is in contempt.  *See Ins. of Cetacean Res. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954-55 (9th Cir. 2014).  The relevant inquiry is whether the DOE took **all reasonable steps within its power** to insure compliance with the Court's August 2014 Order.  *See In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) (per curiam); *Duane B. v. Chester-Upland Sch. Dist.*, No. Civ. A. 90-0326, 1994 WL 724991, at *3 (E.D. Pa. Dec. 29, 1994) (applying standard and

holding school district in contempt for failing to implement remedial orders timely). The party's intent when disobeying the court's order is immaterial, and the contempt "need not be willful." *In re Crystal Palace*, 817 F.2d at 1365 (citing *Perry v. O'Donnell*, 759 F.2d 702, 704-06 (9th Cir. 1985)). Here, it is readily apparent that the DOE's contumacious efforts to avoid the compensatory remedy ordered by the Court warrant a finding of civil contempt.

## III.   FACTS DEMONSTRATING THE DOE'S CONTEMPT

### A.   The August 2014 Order

The Court's August 22, 2014 Order followed months of back-and-forth between Plaintiffs and the DOE as Plaintiffs sought repeatedly to compel the DOE to release class contact information. *See* ECF Nos. 142, 146, 155, 173. The DOE claimed the contact information was unnecessary because Plaintiffs were entitled to no further relief beyond the Ninth Circuit's order, compensatory education is discretionary, and any claims for compensatory education would have to be made on a case-by-case basis by individual Class Members in due process proceedings. *See* ECF Nos.172-1 at 6-11, 176 at 6-11. Plaintiffs sought a class-wide right to compensatory education because they were all equally excluded by Act 163, as well as the appointment of a special master to oversee the administration of the award to the Class. *See* ECF No. 173-1 at 8-24.

Although the Court did not at that time grant Plaintiffs' request for a special master, the Court ruled that "[t]o the extent . . . Plaintiff's motion seeks compensatory education, that portion is **granted**." Comeau Decl. Ex. 5 at 3 (emphasis added). The Court held that the **"members of the class should receive compensatory services to make up for the services missed as a result of that improper determination of ineligibility."** *Id.* at 2-3 (emphasis added).

### B.     The DOE Has Failed to Provide or Even Plan for Services

The August 2014 Order also set forth various initial matters for the parties to address immediately, including release of the contact information for Class Members, consideration of the DOE's ability to provide compensatory education to the Class Members, identification of private service providers, and consideration of prompt class notification and further certification issues. *Id.* at 3-4. As required, the DOE released 1,800 names of Class Numbers between September and December 2014. *See* ECF No. 293-3 ¶¶ 8-10 & ECF Nos. 293-8, 293-9, 293-10 (listing of 1,800 names). However, the DOE submitted no information regarding its ability to provide compensatory education to Class Members, nor any identification of private service providers. *See* Comeau Decl. Ex. 6 at 1-5. In the spring of 2015, Plaintiffs grew even more concerned when they reviewed the DOE's FY 2015-16 budget, which appeared to contain no provision for funding compensatory services for the older Class Members.

Plaintiffs sought discovery on this significant issue from the DOE in the form of a Rule 30(b)(6) deposition. *See* Comeau Decl. Ex. 7. The DOE produced Debra Farmer, the Administrator for the Special Education Section in the Office of Curriculum Instruction and Student Support, as its designee on the topics of the DOE's capacity to provide services to the older Class Members and the DOE's resources (in terms of facilities, staff, and money) to provide for those services. Comeau Decl. Ex. 2 at 4:7-14, 42:20-24, 112:8-15; *id*. Ex. 7. Ms. Farmer confirmed that in the year following the Court's Order, the DOE had not developed or even taken basic steps toward preparing a comprehensive plan of services for the Class. Specifically:

- The DOE had not contacted a **single provider** to discuss providing compensatory services. *See, e.g.*, *id*. at 187:4-13.

- Ms. Farmer was unaware of **any budget** to provide services beyond an allocation for 20-22 year olds and an allocation for assessments of the 18 pilot group members. She admitted **"none of this money has been used for student services."** *Id*. at 147:10-148:15, 154:18-157:4, 197:7-14.

- Ms. Farmer had no idea what facilities, if any were to be used to provide compensatory education services because "it depends on the needs of the student." *Id*. at 189:12-16, 194:22-23.

- Ms. Farmer could not testify to any additional staffing or staff requirements associated with providing compensatory services. *Id*. at 195:3-9.

- She agreed that the DOE had **no concrete plans** to provide services for Class Members or any dedicated resources for those services. *Id*. at 196:25-197:6.

- She had no idea how the DOE proposed to assess the Class Members. *Id.* at 159:7-17.

Despite having no concrete information regarding the DOE's plans or preparations for services to any Class Member, Ms. Farmer nevertheless insisted that the cost was "irrelevant" and the DOE would do whatever needed to be done for the Class Members. *Id.* at 193:7-198:13. She denied that there was any inconsistency associated with this testimony.

## C. The DOE Is Requiring Every Class Member to Prove a Right to Compensatory Education and, as a Result, Refused Compensatory Education to Nearly 85% of the Pilot Group

The DOE has repudiated the Court's directive to provide services to the older Class Members and instead maintains that every Class Member must prove he or she was injured and is entitled to compensatory education. *See, e.g.*, Comeau Decl. Ex. 8 at 32 ("Plaintiffs must produce evidence regarding the need for services to remedy educational deficits caused by a denial of FAPE."); *see also id.* ("Proof of standing and injury are jurisdictional requirements . . . Plaintiffs must establish that they suffered an actual injury because of Act 163 . . . .").[1] As recently as December 2015, the DOE attempted to relitigate the August 2014 Order in briefing before Judge Chang, concluding that it is entitled to demand

---

[1] *See also id.* Ex. 6 at 184 ("We also assume that Plaintiffs are aware that under the IDEA, Plaintiffs seeking relief have the burden of proof to establish their damages."), Ex. 6 at 168-171.

8

individualized proof of injury prior to making any offer of compensatory education to any Class Member. *Id.* Exs. 8-9.[2]

The DOE applied this theory in its May and June 2015 assessments of 18 Class Members (the "Pilot Group"), which the DOE insisted be conducted solely by DOE staff. *See* Ex. 10. The DOE issued initial versions of its reports regarding compensatory services in July, then revised and reissued them on August 24, 2015. In the revised versions, 15 out of the 18 reports—covering nearly 85% of the pilot group—stated that "Compensatory services are not needed to remedy a free appropriate public education that was not provided." This was because, in the DOE's estimation, "An additional 2 years of education would not produce alternate results." *See* Comeau Decl. ¶ 6 & Ex. 3. The reports did not explain what "alternate results" referred to, and provided only the most general description of what actual skills and abilities might have formed the basis of this conclusion.[3] *See, e.g.*, Ex. 3; *cf.* Ex. 6 at 168-71 (arguing that the assessors "applied the correct legal analysis" to determine no compensatory education was needed).

---

[2] *See also* Ex. 6 at 185 (asserting that "individualized cases" should proceed in due process hearings).
[3] Plaintiffs prepared counterproposals to these reports, beginning with the six pilot group members who had no other State services, but never received a response from the DOE. *See* Comeau Decl. ¶ 7 & Ex. 6 at 203, 213-14, 226, 238, 250, 263.

**D.      The DOE's Efforts Are Primarily Devoted to Shrinking the Number of Class Members Who Can Receive Services**

Rather than plan for and provide the Class Members with services, the DOE primarily focused on disputing the eligibility of as many Class Members as possible and, more recently, on striving to close off the Class so that no Class Members may gain access to compensatory services if those Class Members have not already been found.

For a large part of 2015, the parties attended weekly status conferences with Judge Chang, and filed weekly status reports in advance of those conferences.  *See* Comeau Decl. Ex. 6.  The reports reflect significant work on Plaintiffs' part as Plaintiffs attempted to move the case toward the remedy ordered—contacting service providers to obtain costs and estimates (*e.g.*, Ex. 6 at 93-100), proposing various ways to determine services such as a case manager approach (*id.* at 176), services groupings[4], and a court consultant (*id.* at 81, 100-01), searching for missing Class Members (*e.g.*, *id.* at 13, 51, 68-69, 238-40, 250), deposing the DOE's person most knowledgeable regarding the DOE's capabilities

_____

[4] Three months ago, Plaintiffs proposed a matrix with a global range of services that could be offered to Class Members with varying disabilities; aside from cursory feedback, the DOE has failed to respond.  *See* Comeau Decl. ¶ 19 & Ex. 15; *see also id*. Ex. 6 at 225-26, 249, 262, 268-269).

and its progress (*id.* at 52, 60), and issuing frequent requests for the DOE to provide services to the Class (*e.g.*, *id.* at 47-48, 58-59, 65).

The reports also reflect significant inaction on the part of the DOE. *See, e.g.*, Ex. 6 at 72-73 (DOE "willing to discuss assessments" of additional class members but waiting on consents to release educational records[5]); *id.* at 51 (DOE refusing to fund search for updated contact information); *id.* at 233 (same); *id.* at 35, n.3 (DOE refusing to provide phone numbers for Class Members); *id.* at 160 (DOE "intends to review" Plaintiffs' listing of service providers, but without follow-up); *id.* at 171 (listing five service providers and claiming it cannot do any more than that because of procurement laws).[6]

---

[5] The idea that FERPA consents to release education records are a prerequisite to participating in this lawsuit is absurd and yet has been repeatedly advanced by the DOE.

[6] The status reports do reflect occasional fits and starts by the DOE, when prodded by Magistrate Judge Chang. Not surprisingly, these brief bursts of activity have not yielded concrete results. As discussed above, at Judge Chang's urging, the DOE agreed to assess a pilot group in December 2014. But the assessments did not happen until May/June of the following year, and the final reports concluded no compensatory education was warranted for 85%. *See* Comeau Decl. ¶ 6 & Exs. 3, 6 at 168-171. Because the DOE was insisting on obtaining signed consent forms from Class Members, Judge Chang urged the DOE to hold in-person sessions to allow Class Members to come in to sign the forms. The DOE agreed to hold "help desks," but (1) made those available only to the 93 class members (out of 1,800) whom the DOE agreed were "undisputed"; and (2) did not actually sign any Class Member up for assessments or services during those sessions. *See* Ex. 6 at 142-43, 204. These Class Members were only asked to sign a consent form. *See* (continued...)

The DOE has been substantially more energetic in one area.  In December 2014, the DOE moved to modify the Class to presumptively exclude as ineligible individuals who had left school more than six months before they turned 20.  ECF No. 200.  This motion was briefed and the Court denied it from the bench.  ECF No. 220.

In July 2015, the DOE indicated it wished to challenge several hundred members of the Class as allegedly ineligible for services.  Ex. 6 at 66. The DOE has never explained why these individuals were identified on the DOE's lists of potential Class Members produced months earlier, nor has it explained how its revised Class estimate could be accurate given the DOE's federally-mandated reports stating that, during the existence of Act 163, no fewer than 1,682 students had exited prior to age 22.  *See* Comeau Decl. Ex. 12.  In November 2015, the DOE sought a ruling from Judge Chang that the Class Members the DOE claims are underage or left prior to age 20 should be excluded from the Class, and at that time objected to a total of 277 Class Members.  *See* Pls.' Opp. to DOE Mot. re

_____

(...continued)

ECF No. 297-4 at A0128.  The DOE has not taken any other steps to provide compensatory services to the undisputed Class Members, despite several attempts by Plaintiffs to move this group forward.  *See, e.g.*, Ex. 6 at 65-66, 175-76, 214; Ex. 11.

Identifying Class Members at 21.[7]  As for those in the Class who had not yet been

reached—approximately 1,175 individuals—the DOE argued that they should be

cut off from this lawsuit and should lose their entitlement to the remedy ordered in

the Court's August 2014 Order.  *See* ECF No. 297; see Pls.' Mot. re Identification

of Class Members at 11 & Exs. 5-7, 12, 16 thereto (explaining number of Class

Members still not reached).

### E.   The DOE Is Not Attempting to Serve Even the Undisputed Class Members

The DOE offered no objection to 93 Class Members on Plaintiffs'

original list.[8]  Comeau Decl. Ex. 13.  However, even for those whom the DOE does

not dispute are eligible, the DOE has still failed to offer them any services.

In response to Plaintiffs' repeated call for services to this group, the

DOE eventually issued an extensive list of intrusive demands to be met by each

Class Member before the DOE was willing to take any steps toward offering

_____

[7] As Plaintiffs explained in their motion, the DOE's request to eliminate "drop
outs" and others who left school prior to age 20 should be rejected because it is
contrary to the class definition.  The DOE's effort to limit individuals as "too
young" ignores the fact that many of these Class Members were misinformed
about their rights by the DOE because they left school before Act 163 was finally
repealed in 2014 and they were never given full, complete and accurate
information regarding their right to return, in violation of the IDEA and the DOE's
own policies.  *See* ECF No. 293-1 at 28-24.  The parties' cross-motions on this
issue were heard before Magistrate Judge Chang on January 27, 2016.

[8] The "undisputed" list has grown as the DOE has not objected to all Class
Members who have expressed interest since August 2015.

services.  *See* Comeau Decl. Ex. 4.  These demands included the name and contact

information for all service providers used since 2010, all psychologists, doctors,

and counselors who provided services to the Class Members since 2010, all

schools or programs attended by the Class Members since 2010, all employment

since 2010, and consent forms for the DOE to obtain records from all of these

places.  *See id.*  Plaintiffs advised that questions regarding current services could

simply be asked to the Class Members when the DOE met with them.  Since then

Plaintiffs have renewed their requests for services to this group, but have simply

been ignored.  *See* Comeau Decl. ¶ 15; *id.* Ex. 6 at 214, Ex. 11.

### F.    The DOE Is Hindering Contact with the Class

Two-thirds of the Class have not yet been reached and therefore are

unaware of the Court's August 2014 Order.  The DOE has hindered Plaintiffs'

efforts to contact the class over the past 18 months.  These delays include:[9]

- Refusing to turn over contact information for the class until Plaintiffs filed and won two motions to compel this information;

- Refusing to turn over to Plaintiffs the phone numbers of Class Members on the basis that these phone numbers were not "contact information" under the Court's August 2014 Order;

---

[9] These delays are documented in detail in Plaintiffs' *Motion re Identification of Class Members*.  *See* ECF No. 293 at 6-11 & Exhibits 5-7, 9, 12-13 and 17 thereto, and Declaration of Michelle Comeau, ECF No. 293-3.

- Refusing to exercise its statutory right of access to the contact information held by the other State agencies that provide services today to many of the Class Members.  *See* HRS § 92-F[10];

- Agreeing to pay for Ward Research calls, but then delaying the scripts for two and a half months, and stonewalling Plaintiffs' subsequent efforts to update the contact information using a public data service.

- Ordering an employee of the Department of Public Safety, who had volunteered to help locate more than 10% of the class who are incarcerated, to stop his search—shortly after Plaintiffs reported this information in a status report.  *See* ECF No. 293-1 (Comeau Decl.) ¶ 25 & Ex. 21 thereto.[11]

In spite of these facts, Suzanne Mulcahy, the head of the Office of Curriculum Instruction and Student Support, recently represented to the House Finance Committee that the DOE was presently engaged in a "huge" "interagency collaborative effort" to locate and provide services to the older Class Members. Comeau Decl. Ex. 1.  Plaintiffs are at a loss as to how this could be even remotely true, given that the DOE has flatly refused to reach out to any other agencies to obtain contact information for Class Members.

---

[10] If there are FERPA or HIPAA issues associated with the release of the updated contact information to Plaintiffs, the appropriate remedy is a court order granting release of the updated contact information for the Class Members, whose names and old addresses were previously provided to Plaintiffs.  *See* 34 C.F.R § 99.31(a)(9); 45 C.F.R. §164.512(e).

[11] Judge Chang subsequently asked the DOE to discuss with DPS resumption of the search for incarcerated Class Members, but Plaintiffs have received no word that the search is proceeding.

### G.   The DOE Is Either Mismanaging Its Public Resources or Manipulating Its Reporting of Money Being Spent

The DOE, which has not budgeted a dollar toward providing compensatory education to the older Class Members, claims to have spent $3.4 million—or nearly $2,000 per person—to identify and notify Class Members of the Court's decision.  *See* Ex. 14.  This is either false[12] or suggests significant mismanagement of public funds if the DOE truly spent forty thousand hours locating and identifying Class Members, the equivalent of approximately 20 people working full time for a year.  It is difficult to comprehend how such a claim could be true, particularly since the DOE released the majority of the 1,800 Class Member names approximately a month after it was ordered to do so by the Court.  The DOE also claims expenditures of $192,444 to provide guardian contact information for 41 individuals ($5,000 per person) and "Assessment Team" charges totaling $259,000 to assess 18 individuals (more than $14,000 per person).

---

[12] As Plaintiffs noted in their Opposition to the DOE's Motion re Identifying Class Members, the sole document submitted as "evidence" of this expenditure is simply a shorthand notation referring to various costs and is not authenticated or explained by any DOE personnel.  The DOE has also provided costing information that contradicts the statements in its exhibit.  For example, in September 2015, the DOE claimed it spent a total of $40,000, not $259,000, on assessments.  ECF No. 312-6 ($40,000).  The DOE has not taken any other steps to provide compensatory services to the undisputed class members, despite several attempts by Plaintiffs to move this group forward.  *See* Ex. 6 at 65-66, 175-176, 236-237, and Ex. 11.

## IV.    THE DOE IS VIOLATING THE COURT'S AUGUST 2014 ORDER

The facts speak for themselves.  The DOE has fallen far short of the requisite diligence compelled by the Court's August 2014 order.  *See In re Crystal Palace*, 817 F.2d at 1365.  The DOE has neglected to marshal its own resources or assert the authority it holds as an agency of this State.  The DOE neglected even to provide the basic information required by the August 2014 Order, necessitating a Rule 30(b)(6) deposition for Plaintiffs to try to piece together the DOE's progress in this case.  It has failed to enlist or order the placement of needed and available personnel, has created no budget for services, and has no idea how it would even determine what services are needed.

The DOE has created a theory of the case which treats the Court's grant of compensatory education as a nullity and demands Plaintiffs "prove their case" for each and every Class Member.  Rather than taking "all reasonable steps" within its power to actually provide services to the Pilot Group of 18 Class Members, the DOE instead examined them and unilaterally concluded that 15 of them were entitled to nothing at all.[13]  Likewise, with respect to the 93+ undisputed

---

[13] Plaintiffs are incredulous that the Department of Education of the State of Hawai`i—whose mission is to "develop[] the academic achievement, character, and social-emotional well-being of our students to the fullest potential" and whose "core values" include "commitment to equity an excellence" and "meaningful learning" —could conclude that any one of its former special education students,

(continued...)

Class Members, the DOE's only effort toward providing them services has been

help desks so that they could sign a DOE-mandated permission slip to be assessed,

and a set of intrusive demands for information and proposals from each for their

own plans of services.

"All reasonable steps" to insure the DOE complies with the August

2014 order surely includes making reasonable efforts to actually notify the

individuals to be served.  Yet the DOE has made no effort to focus on finding class

members (and in fact denies its obligation to do so), content to sit back and allow

Plaintiffs to do the work, and then object after the fact to Class Members who have

already been found.  It has displayed indifference to the actual needs of the Class

Members, who are continuing to age without having the educational benefits to

which the IDEA gave them the right.[14]  Moreover, the DOE has recently presented

---

(...continued)

much less nearly 85% of them, are incapable of attaining any additional skills or
abilities in two years of schooling.  *See*
http://www.hawaiipublicschools.org/ConnectWithUs/Organization/Mission/Pages/
home.aspx.

[14] The DOE's occasional activities, such as the help desks, the pilot group
assessments, or its payment for Ward Research—which have done little to advance
the ball in this case—should not persuade the Court that the DOE has complied
with its order.  *See Duane B.*, 1994 WL 724991, at *4 ("The District['s] last-
minute bursts of activity have not yielded concrete results, and they are not
evidence that the defendants have acted with steadfast purpose to fulfill their
obligations under the Remedial Orders.").

evidence of significant mismanagement of the financial resources it has dedicated to this case over the past year and a half.

Most disturbingly, the DOE's conclusion that the majority of the Class Members are not entitled to services because they were not harmed by exclusion from school is contrary to the purpose of the remedy phase of this case. This Court has *already held* that the Class Members are entitled to compensatory education because Plaintiffs had established, as a matter of law, that the Class lost educational opportunity.  The Class Members have had the right to compensatory services for a year and a half, yet it is plain that most of them are no closer to actually reaching this goal than they were when the Order was issued.  The DOE's actions under these circumstances demonstrate contempt of Court.  *Cf. Duane B*., 1994 WL 724991 (holding school district in contempt for failure to comply with remedial orders and consent decree a year and a half after the final decree); *Murphy ex rel. Murphy v. Timberlane Reg. Sch. Dist*., 855 F. Supp. 498 (D.N.H. 1994) (holding school district in contempt for failing to provide services for a year after court had ordered compensatory education) ; *Aspira of N.Y. Inc. v. Bd. of Educ. of N.Y*., 423 F. Supp. 647 (S.D.N.Y. 1976) (holding school board in contempt for failing to implement ordered program over two years).

## V.     REMEDY FOR CONTEMPT

The remedy for civil contempt seeks to coerce future compliance with the court's orders and remedy past noncompliance.  *See United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947).  Fining the DOE is not likely to achieve the goal of compensatory services, because the DOE has shown itself more than willing to pay for the administrative and legal cost of this case rather than provide services.  *Cf.* Ex. 14 (claiming administrative staffing costs of $2.5 million associated with this case).  The DOE needs an individual who can help it fashion coherent and precise goals and plans, as well as someone to ensure proper allocation of resources and benchmark progress on behalf of the Class Members. Under these circumstances, the Court should appoint a special master to oversee the DOE's progress in this case going forward.  The Court should also award Plaintiffs their attorneys' fees associated with this motion.

### A.     A Special Master Is Appropriate to Manage the Complex Remedial Issues the DOE Has Not Yet Addressed

Pursuant to Rule 53(a) of the Federal Rules of Civil Procedure, the Court may appoint a special master to address post-trial matters "that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  Special masters alleviate unnecessary burdens to litigants, and the avoidance of delay is one of the "cornerstones" of Rule 53.  *See Cruz v. Hauck*, 515 F.2d 322, 330 (5th Cir. 1975) (approving use of special master in civil rights

case involving jail restrictions on inmates' possessions).  A master can "improve the judicial process" by, among other things, "bringing to the court skills and experience which courts frequently lack."  *Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 747 (6th Cir. 1979) (approving appointment of master to oversee school desegregation).

Courts that have ordered class-wide, equitable relief to special education and other civil rights plaintiffs have in turn relied upon special masters to assist the parties in (1) structuring a concrete plan of action and (2) applying a general ruling on an individualized basis.  In *Blackman v. District of Columbia*, 185 F.R.D. 4 (D.D.C. 1999), for example, the United States District Court for the District of Columbia determined that the defendant District of Columbia was violating the IDEA by failing to act on requests for due process hearings timely.  After time passed and the defendant continued to delay urgent due process requests, court determined a special master should be appointed to adjudicate class members' claims.   The court noted that appointment of a master—while the "exception and not the rule"—was appropriate in light of the circumstances, where the school district's liability had already been established, the district was still out of compliance with the IDEA with respect to many children, and the class

members' requests, which were often complex, required immediate resolution.  *See id*. at 6-8.[15]

**B.     The Court Should Appoint a Special Master Here**

A special master should be appointed to structure and oversee the compensatory remedy because this case, like *Jose P.*, *Blackman*, and the other examples cited herein, involves a complex equitable remedy that the DOE is demonstrably ill-equipped to fashion and because the class members seeking

---

[15] Similar examples abound.  In *Jose P. v. Ambach*, 669 F.2d 865 (2d Cir. 1982), the Eastern District of New York ruled that the New York City and New York State failed to properly identify and educate disabled children.  *Id*. at 867.  Faced with "bureaucratic infrastructure" and a "polycentric" problem, the district court then determined the classwide remedy should be fashioned "by a master, taking a structural approach, rather than [] more traditional adjudication."  *See id*. at 869 (describing district court's assessment and affirming district court's determination that exhaustion of administrative remedies, under the circumstances, would have been impossible and futile).  *See also Frederick L. v. Thomas*, 557 F.2d 373 (3d Cir. 1977) (affirming district court's ruling, including appointment of special master, to oversee remedy requiring state to properly find and identify disabled students); *Petties v. District of Columbia*, 538 F. Supp. 2d 88, 91 (D.D.C. 2008) (master appointed to resolve individual requests for injunctive relief after District of Columbia found to be violating its obligations to fund private providers under the IDEA); *John B. v. Menke*, 176 F. Supp. 2d 786, 807-09 (M.D. Tenn. 2001) (appointing special master to oversee state's compliance with the requirements of the federal early periodic screening, diagnosis, and treatment program for children); *Duane B.*, 1994 WL 724991, at *11-*12 (appointing special master to remedy school district's contempt of remedial orders); *Penn. Ass'n for Retarded Children v. Com. of Pa.*, 343 F. Supp. 279, 287-88 (E.D. Pa. 1972) (settlement of civil rights litigation challenging various state laws excluding certain disabled children from attending public school included appointment of special masters to oversee state's plan to locate and educate previously excluded children).

services will have a need for regular access to an impartial decisionmaker.  The

past year and a half has demonstrated that the DOE lacks the will to move this case

beyond the status quo.  It has also demonstrated that the parties have genuine

disputes about several critical, ongoing post-trial issues.  Without a master tasked

with ensuring the DOE actually fulfills its obligation to deliver compensatory

education, there is a significant likelihood that the DOE will simply continue to

delay and defer as it has done to date.

### 1.    Duties of the Special Master

The special master should focus on two primary objectives: (1) to

create a structure for the DOE to comply with this Court's order requiring

provision of compensatory education to the class members; and (2) to resolve

individual disputes as they arise.

Within these objectives, the special master should be empowered by

this Court to use all available means to: (1) identify and locate all the eligible class

members; (2) identify the DOE's capacity to provide compensatory education for

the class members (who may be 29 or older before needed compensatory services

have been completed); (3) identify the private service providers who may be

needed to provide compensatory education to the class members and negotiate

terms on which they will provide services to the class members; (4) develop an

efficient procedure for requiring the DOE to determine promptly, consistent with

the IDEA, what services are needed by each class member and where and by whom they can best be provided; (5) identify a team of independent experts who can assist the class members in evaluating the program proffered by the DOE and identifying and recommending alternative programs, if necessary; and (6) establish a procedure for conducting hearings to resolve any disputes between the DOE and class members regarding the nature, scope, and delivery of the required compensatory services.

### 2. Compensation of the Special Master

Plaintiffs are a class of handicapped young adults.  They cannot share in any of the cost of the special master.  Moreover, allocating the entire cost of the special master to the DOE is also reasonable because the DOE's intransigence with respect to this Court's Order necessitates the appointment.

### C. Attorneys' Fees

Courts routinely award attorneys' fees to the moving party where there has been a finding of contempt.  *See Perry,* 759 F.2d at 704-06 (affirming award of attorneys' fees for successful prosecution of civil contempt); *In re Himmelfarb*, Civ. No. 14-00352 SOM/RLP, 2015 WL 400617, at *9-*10 (D. Haw. Jan. 28, 2015) (an award of attorneys' fees associated with finding of contempt is "totally within the law"); *John T. ex rel. Paul T. v. Del. Cnty. Inter. Unit*, No. Civ. A 98-5781, 2003 WL 22006810 (E.D. Pa. Aug. 22, 2003) (awarding attorneys'

fees to plaintiffs associated with contempt order against school district).  Plaintiffs request the Court award reasonable attorneys' fees associated with bringing this motion, in an amount to be presented following adjudication of the motion.

## VI.    CONCLUSION

"A responsibility to educate disabled children and compensate them for deficiencies in that education cannot hang in the air, as an unfulfilled aspiration."  *Friendship Edison Charter Sch. Collegiate Campus v. Nesbitt*, 583 F. Supp. 2d 169, 172 (D.D.C. 2008).  It must "be enforced by concrete action."  *Id.* For the reasons set forth above, the Court should grant Plaintiffs' Motion, adjudge the DOE to be in contempt of the Court's August 2014 Order, and appoint a special master to coerce the DOE to actually comply with the Order and provide services to the older Class Members.

DATED: Honolulu, Hawai`i, February 2, 2016.


/s/ Michelle N. Comeau
PAUL ALSTON
KRISTIN L. HOLLAND
MICHELLE N. COMEAU
Attorneys for Plaintiffs