PAUL ALSTON               1126
KRISTIN L. HOLLAND        10063
MEREDITH G. MILLER        10744
ERIKA L. AMATORE          8580
JANNA WEHILANI AHU        10588

DENTONS US LLP
1001 Bishop Street, Suite 1800
Honolulu, Hawaiʻi  96813
Telephone: (808) 524-1800
Facsimile: (808) 524-4591
E-mail:  paul.alston@dentons.com
         kristin.holland@dentons.com
         meredith.miller@dentons.com
         erika.amatore@dentons.com
         janna.ahu@dentons.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| E.R.K., by his legal guardian R.K., R.T.D., through his parents R.D. and M.D.; HAWAII DISABILITY RIGHTS CENTER, in a representative capacity on behalf of its clients and all others similarly situated,<br><br>      Plaintiffs,<br><br>   vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawaiʻi,<br><br>      Defendant. | Case No. 10-00436 SOM-RT<br><br>**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION [ECF 560];** DECLARATION OF MEREDITH G. MILLER; DECLARATION OF JAMES E. DUFFY, JR.<br><br><u>Hearing</u>:<br>Date:    May 18, 2020<br>Time:    10:30 a.m.<br>Judge:   Hon. Susan Oki Mollway |

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................1

II.  PRELIMINARY MATTERS .................................................................1

III. BACKGROUND ...................................................................................3

    A.   The Lawsuit and Settlement Agreement ...................................3

    B.   The Individuals with Disabilities Education Act (IDEA) ..................5

    C.   Services Fund Disbursement Difficulties ...........................6

    D.   The COVID-19 Pandemic ...................................................9

    E.   Each ECM Presents a Unique Challenge ...........................10

    F.   Adaptive Vehicle Leases ..................................................12

    G.   Special Needs Trusts ........................................................13

    H.   ABLE Accounts ...............................................................15

IV.  LEGAL ANALYSIS ...........................................................................16

    A.   There is No "Claim" Underlying DOE's Motion, So the Motion Must Fail ...............................................................17

    B.   DOE's Procedural Improprieties Aside, DOE Cannot Meet the Standard for Injunctive Relief ..........................................18

        1.   DOE Cannot Prevail on the Merits ..........................18

        2.   There is No Irreparable Injury to DOE ...................19

        3.   The Balance of Equities Favors the Class ...............20

        4.   Public Policy Favors the Class ...............................20

    C.   Disbursements Are within the Scope of the Settlement Agreement ......................................................................21

        1.   Adaptive Vehicle Leases .........................................21

i

2.      Special Needs Trusts and ABLE Accounts .............................23

D.      Even if the Settlement Agreement Does Not Contemplate a
        Procedure for Establishing SNTs and ABLE Accounts, Good
        Cause Exists to Modify the Disbursement Procedures.......................24

V.      CONCLUSION.............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Devose v. Herrington*,
  42 F.3d 470 (8th Cir. 1994) ...............................................................................17

*Global Horizons, Inc. v. U.S. Dep't of Labor*,
  510 F.3d 1054 (9th Cir. 2007) ..........................................................................18

*Kaiser Found. Health Plan, Inc. v. Queen's Med. Ctr., Inc.*,
  423 F. Supp. 3d 947 (D. Haw. 2019) ................................................................18

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ..........................................................................18

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
  810 F.3d 631 (9th Cir. 2015) ........................................................................2, 17

*Sampson v. Murray*,
  415 U.S. 61 (1974) .............................................................................................20

*Taylor-Failor v. Cty. of Haw.*,
  90 F. Supp. 3d 1095 (D. Haw. 2015) .................................................................18

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...............................................................................................18

**Federal Statutes**

Stephen Beck Jr. Achieving a Better Life Experience Act of 2014 (26
  U.S.C. § 529A) ...................................................................................................15

Social Security Act (42 U.S.C. §§ 301-1305) ..........................................................14

**Rules**

Local Rule 7.8 .............................................................................................................2

FRCP Rule 65 ........................................................................................................1, 16

10109966\000001\114610526

**Regulations**

34 C.F.R. § 300.1 ..................................................................................22

34 C.F.R. § 300.34 .......................................................................5, 13, 21

34 C.F.R. § 300.43 ..................................................................................14

### MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION [ECF 560]

## I.   INTRODUCTION

Plaintiffs oppose *Defendant's Motion for Preliminary Injunction*, filed on April 3, 2020 [ECF 560] ("**Motion**").  The Hawaiʻi Department of Education's ("**DOE**'s") request for injunctive relief is based on the Settlement Administrator's decision to approve certain types of disbursements from the Services Fund.  It is not related to claims alleged in the July 27, 2010 Complaint.  Rather, it seeks to delay administration of the settlement so the funds escheat to DOE at the settlement deadline.

DOE's request for preliminary injunctive relief should be denied because: (1) FRCP Rule 65 is not the appropriate vehicle for the issues presented by the Motion, (2) even if it were, DOE cannot meet the standard required to obtain a preliminary injunction, (3) the planned disbursements for adaptive vehicle leases, Special Needs Trusts ("**SNT**s"), and ABLE accounts all comply with the terms, purpose, and spirit of the Settlement Agreement, and (4) to the extent the process for making payments to SNTs and ABLE Accounts is not contemplated under the Settlement Agreement, good cause exists to modify the process.

## II.   PRELIMINARY MATTERS

On April 9, 2020, the Court issued a minute order, stating:

> The court would be aided by the inclusion of discussions in upcoming briefs of whether the motion is or is not properly

1

posed as one for injunctive relief.  The court recognizes the parties' need for a ruling on the substantive issue, but would like clarification as to why the issue is presented through the procedural vehicle of a request for injunction (rather than, for example, a request for clarification or declaratory relief).  Is there some action that is ongoing or imminent that this court is being asked to enjoin, or is everything simply frozen pending a ruling by the court?

EO re Local Rule 7.8 Statement [ECF 565].

The first question is easy: the Motion is not proper.  This case has been dismissed.[1]  There is no pending claim upon which DOE may seek preliminary injunctive relief.  Therefore, the Court cannot issue an injunction.  *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 637 (9th Cir. 2015); *see also infra* Part IV.A.  For that reason alone, the Motion should be denied.

However, there is an urgent need to resolve DOE's objections to the Settlement Administrator's planned disbursements.  And, given that the Court has retained "jurisdiction over this matter to assure the effective and timely implementation of the Settlement Agreement and to resolve any disputes . . . with respect to the meaning, effect and proper implementation of the Settlement Agreement,"[2] Plaintiffs urge the court to overlook DOE's procedural error and

---

[1] *Order of Dismissal* filed May 16, 2019 [ECF 520].

[2] *Order Approving Settlement for Class Members* filed Dec. 8, 2017 [ECF 482] ("**Settlement Order**"); *see also Order of Dismissal* [ECF 520] (retaining jurisdiction over "all aspects of the Settlement Agreement, including the continued

2

address the issue of the Settlement Administrator's discretion to approve certain

disbursements without delay.

## III.   BACKGROUND

### A.   The Lawsuit and Settlement Agreement

This case arose from DOE's failure to provide special education and related

services to eligible high school students, in violation of federal law.  *See*

**Settlement Order** [ECF 482] p.2.  After years of litigation, the Ninth Circuit ruled

in Plaintiffs' favor on the merits and, the parties entered into a Settlement

Agreement under which DOE created an $8.75 million Services Fund to provide

special education and related services to the Class, to be distributed and

administered by a Settlement Administrator.  *See id.* at 3; *see also Release,*

*Compromise, and Settlement Agreement* filed Dec. 15, 2017 [ECF 486-1]

("**Settlement Ag.**") ¶ II.B.1.  Under the Settlement Agreement, disbursements to

the 495 eligible Class members ("**ECM**s") must be documented and verified no

later than 4:30 p.m. on December 31, 2020.  *See* Settlement Ag. [ECF 486-1] p.9.

The deadline requires that the funds be committed for class members' benefit; it

does not require that the services be provided before then.  Following an

accounting reconciliation period of two months, any uncommitted funds in the

---

administration of the settlement, any proposed modifications to the Settlement
Agreement, and any dispute arising out of the Settlement Agreement").

Services Fund as of 12:00 a.m. on March 1, 2021, shall be returned to DOE.  *See*

Settlement Order [ECF 482] p.5.

The relevant terms of the Settlement Agreement can be summarized as

follows:

- ECMs are separated into three tiers based on severity of disability. *See* Settlement Ag. [ECF 486-1] ¶ II.B.4.  Each tier is allowed a specified monetary amount.  *Id.*  No individual ECM is "allowed to receive more than $200,000.00 in reimbursement for Services and/or payment for Services from the Services Fund."  *Id.*

- "Services" means "special education and related services which include, but are not limited to: physical therapy; occupational therapy; vocational instruction/counseling; speech therapy; community college; tutoring; assistive technology; credit recovery/GED courses; and any other services that would be available to special education eligible students under the IDEA."  *Id.* at ¶ I.

- The Settlement Administrator manages, controls, and distributes the Services Fund.  *Id.* at ¶¶ II.B.3, II.B.5.

- DOE has "no control over the acts of the Settlement Administrator or the District Court and their staff, and is not responsible for any delay in processing, completion or submission of paperwork, or filing by the Settlement Administrator, District Court, or staff."  *Id.* at ¶ II.B.7.

The Settlement Agreement also sets forth the Settlement Administrator's

duties and responsibilities, and outlines the disbursement procedure.  *Id.* at Ex. 1.

The Settlement Administrator's goal is "to maximize each ECM's timely receipt of

the complement of educational and related services to which he/she is entitled."

*Id.* at Ex. 1, ¶ 1.  When an ECM submits a qualifying invoice for current Services,

proof of payment for past Services, "and/or a treatment plan for future Services,"

the Settlement Administrator reviews and approves the payment and causes a

check to be issued "to the ECM for reimbursement or to the qualified service

provider for payment for Services." *See id.* at Ex. 1, ¶ 2.b.  Treatment plans for

future Services are to be "prepared by a qualified service provider, with payment

made to the qualified service provider[.]" *Id.* at Ex. 1, ¶ 2.b.a.3.  The process for

reimbursement/payment can be modified by the Court, for good cause.  *Id.* at Ex.

1, ¶ 2.b.  ECMs "may also submit requests for reimbursement payment of assistive

technology[.]" *Id.*  The Settlement Administrator makes "the final decision as to

whether an assistive technology expense is acceptable." *Id.*

     **B.**    **The Individuals with Disabilities Education Act (IDEA)**

As noted above, "Services" under the Settlement Agreement means "special

education and related services," including, but not limited to, "any . . . services that

would be available to special education eligible students under the IDEA." *See*

Settlement Ag. [ECF 486-1] ¶ I.  The IDEA "encompasses a broad definition" of

"educational and related services." *See id.* at Ex. 1 ¶ 2.c; Ex. 2.  "Related services"

under the IDEA means "transportation and such developmental, corrective, and

other supportive services as are required to assist a child with a disability to benefit

from special education[.]" *Id.* at Ex. 2 (reproducing 34 C.F.R. § 300.34).  It

includes a wide array of services, including recreation, psychological services,

vocational rehabilitation, parent counseling and training, and specialized equipment for transportation, among other things. *Id.*

### C.    Services Fund Disbursement Difficulties

During the past two years of implementation, Settlement Administrator The Hon. James E. Duffy, Jr. (ret.) and his administrative and contract staff, with the assistance of Class counsel (collectively, the "**Settlement Team**"), have encountered numerous unexpected challenges and delays in the disbursement process.

First, many ECMs can be difficult to coordinate with.  For many reasons (including the passage of many years between filing, appeal, and settlement), the ECMs are hard to track.  Many do not have stable homes or economic circumstances.  The information initially provided by DOE and other State agencies was often outdated, and identifying updated accurate contact information for many ECMs is difficult because many ECMs and their families frequently move and change telephone numbers and e-mail addresses.  Miller Decl. ¶ 4.  Thus far, after hundreds of hours of work by attorneys, paralegals, independent contractors, and private investigators, the Settlement Team has contacted and engaged in the distribution process with 359 of the 495 ECMs.  *Id.* ¶ 5.  Of that group, 224 are in the distribution process; the Settlement Team is working to contact and enroll 100 to participate; five have opted out; three have received their

maximum benefits; and twenty-seven ECMs are incarcerated.[3]  *Id.*  A private investigator is continuing efforts to locate and engage with the remaining 136 ECMs in hopes that they can be located.  *Id.*

Second, the distribution process is slow and labor-intensive.  Miller Decl. ¶ 6.  Each distribution takes weeks, or even months, to process.  *Id.*  After initial contact is made, ECMs or their representatives must fill out an enrollment survey to assess their individual needs.  *Id.*  Next, a member of the Settlement Team guides the ECM to identify appropriate assistive technologies and compensatory services that may be acquired using the Services Fund.  *Id.*  ECMs often do not have receipts for qualified purchases they have made since leaving high school, in which case the Settlement Team drafts an affidavit attesting to the reimbursement. *Id.* ¶ 7.  And finally, the Settlement Team collects and verifies the ECM's or service provider's banking information, completes the documents to be reviewed by the Settlement Administrator, processes the Settlement Administrator's subsequent approvals, secures the ECM's release, and directs the Bank of Hawaii to make disbursements.  *Id.* ¶ 8.

---

[3] At a status conference before the Court earlier this year, DOE offered to "take the lead" to provide services to incarcerated individuals, since they are in State custody.  Miller Decl. ¶ 25.

Third, ECMs and their caregivers are often reluctant to use their entire allotments in a single payment, preferring to keep funds available for future needs. Miller Decl. ¶ 9.  For example, many ECMs prefer to fund an initial assessment period with a service provider, after which the service provider develops a customized schedule of future services to address the ECM's unique needs identified during the assessment period.  *Id.*  This also means that reimbursements and payments from the Services Fund are made piecemeal; for example, one ECM participating in the settlement has already submitted 12 claims.  *Id.*

Fourth, complicating matters further, each ECM has highly individualized needs and preferences.  Miller Decl. ¶ 10.  Once those needs are identified, it can be difficult to locate appropriate service providers.  *Id.*  In remote communities, and on neighbor islands in particular, there are often very few, if any, service providers.  *Id.*  And those few available service providers often do not have capacity to take on additional clients.  *Id.*

Fifth, throughout the settlement administration process, DOE has frequently questioned the Settlement Administrator's decisions and "objected" to certain disbursements, further delaying what is already a challenging process.  Miller Decl. ¶ 11.  Under the terms of the Settlement Agreement, DOE is not supposed to have <u>any</u> role in disbursing the Services Fund.  *See* Settlement Ag. [ECF 486-1] ¶ 7 (DOE has "no control over the acts of the Settlement Administrator"); *see also id.*

8

at ¶ 2.b (Settlement Administrator has sole authority to approve payments).

Nonetheless, from the outset, the Settlement Administrator and Settlement Team,

as a courtesy, created a disbursement recommendation review process that

provided DOE with notice in response to its desire to review the Settlement

Team's work and track the expenditure of funds.  Duffy Decl. ¶ 5.

This courtesy, unfortunately, resulted in DOE's obstruction of the

implementation process.  Miller Decl. ¶ 11.  The Services Fund was created to

benefit the Class by providing a remedy in answer to DOE's violation of the law;

however, DOE has consistently treated it as if it is State money to be "protected"

as public funds.  *Id.* ¶ 12.  DOE has often taken the position that the Services Fund

should not fund anything DOE would not have provided while the ECMs were still

in high school.  *Id.*  Unfortunately, that is precisely why the Services Fund exists:

because DOE did <u>not</u> provide special education and related services to eligible

students when they needed them most, thereby violating federal law.

### D.     The COVID-19 Pandemic

All of the foregoing challenges have now been exacerbated by the COVID-

19 pandemic.  Not only are many medically compromised ECMs now unable to

leave their homes to seek Services, but service providers' ability to deliver those

Services has been affected; in many cases, their very professions and small

businesses are threatened.  Miller Decl. ¶ 13.  Countless clinics and private

9

practices that offer "non-essential" therapeutic services such as occupational

therapy, yoga, massage, chiropractic services, spinal alignments, speech therapy,

fitness, and behavioral services have been shut down.  *Id.*  The stay-at-home orders

have negatively affected the development of many Service plans either already

underway or in the works.  *Id.*  ECMs and service providers now face, at the very

least, a two- to three-month total cessation of services, plus many more months of

restart challenges related to both social distancing and finances.  *Id.*

Some service providers have already notified the Settlement Team that they

are going out of business as a result of the pandemic, and do not have plans to re-

open.  Miller Decl. ¶ 14.  Thus, the Settlement Team will be tasked with redoing

already completed service plans by finding substitute service providers that will

likely have large backlogs of regular clients, meaning ECMs will be forced to

forgo services as they wait their turns.  *Id.*  Meanwhile, in discussions with the

Court and Settlement Administrator, DOE has been reluctant to commit to extend

the settlement disbursement period, although they have informally expressed a

willingness to do so.  The deadline currently remains December 31, 2020.  Miller

Decl. ¶ 15.

### E.    Each ECM Presents a Unique Challenge

Throughout the settlement period, the Settlement Team has worked

diligently to find ways to accommodate each ECM's special needs.  Miller Decl.

10

¶ 16.  Each ECM faces a unique set of challenges, and the Settlement Team must address those on a case-by-case basis.  *Id.*  Some of the most profoundly disabled ECMs in Tier 1[4] present the greatest challenges.  *Id.*  Although their basic supportive needs may be covered by other government sources such as the Medicaid I/DD Waiver, given their profound disabilities, traditional compensatory education services can be difficult to deliver.  *Id.*

For example, ECM L.H. has been diagnosed with numerous disabilities, including hearing impairment, epilepsy, autism, and scoliosis, among others. Miller Decl. ¶ 17.  L.H. is able to walk, but needs assistance at all times and uses a wheelchair outside the home.  *Id.*  L.H. is unable to attend care facilities due to a weakened immune system and need for constant one-on-one supervision.  *Id.*  As a result, L.H.'s father retired to provide full-time care.  *Id.*

In order for L.H. to participate in any outside activities, including family gatherings, community activities, appointments to obtain Services, and medical appointments, L.H. requires wheelchair-accessible transportation.  *Id.*  In the past, L.H.'s family has rented a van with a fold-up style ramp, but L.H. habitually placed his fingers and hands into the folded ramp and became injured.  *Id.*  While a

---

[4] Tier 1 ECMs are entitled to up to $200,000 in Services under the Settlement Agreement.

11

folded ramp may be appropriate adaptive transportation for some persons with disabilities, it presents a danger for L.H. *Id.*

Unfortunately, L.H. is also unable to use public adaptive transportation such as the Handi-Van due to his epilepsy, and car rides must be planned as short trips, or as longer trips broken into shorter legs, so that L.H. can periodically exit the vehicle when experiencing mild seizures. *Id.* In the event of a grand mal seizure, L.H. requires immediate medical attention and must be delivered by direct route to the closest emergency room. *Id.* Public transport drivers are not medically trained to provide these services, and are instead instructed to stop on the side of the road and call for an ambulance in such circumstances. *Id.* This would pose a danger to L.H., making public transportation both impracticable and inappropriate for L.H. and his family.

### F.   Adaptive Vehicle Leases

L.H.'s unique circumstances illustrate the need for flexibility in administering the Services Fund. After investigating and evaluating the costs and availability of accessible transportation from public and private transportation providers on Oahu and many neighbor islands, the Settlement Administrator and Settlement Team identified a need for some ECMs, such as L.H., to have access to personal adaptive transportation to safely access the compensatory education, related services, and community integration to which they are entitled.

12

As a result of the Settlement Team's investigations, the Settlement Administrator determined that personal adaptive transportation leases would best meet some ECMs' needs, and would fall within the "specialized transportation equipment" provision of the Settlement Agreement that expressly permits funds for "Services," including "Transportation," which includes "[s]pecialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability." *See* Settlement Ag. [ECF 486-1] ¶ I; Ex. 1 ¶ 2.c; Ex. 2 (34 C.F.R. § 300.34 (c)(16)(iii)); Duffy Decl. ¶ 6.

No requests for adaptive vehicle leases have been formally submitted to the Settlement Administrator, although a number are being developed by the Settlement Team.  Duffy Decl. ¶ 6.  The parties have discussed adaptive vehicle leases for over a year and DOE is aware that the Settlement Team intends to submit requests in the near future.  *Id.*  The Settlement Administrator has announced his intention to approve these disbursements as appropriate.  *Id.*

### G.    Special Needs Trusts

Similar circumstances led to the Settlement Administrator's determination that Special Needs Trusts ("**SNT**s") would both serve the interests of some ECMs and fall within the parameters of the Settlement Agreement.  SNTs are specialized trusts that allow beneficiaries with disabilities to enjoy the use of property held in the trust, while at the same time not affecting the beneficiary's eligibility to receive

13

essential needs-based government assistance such as SSI and Medicare pursuant to Section 1917(d)(4)(A) of the Social Security Act.  In particular, SNTs would facilitate the delivery of critical "transition services" that DOE failed to provide the Class by forcing them to exit high school early.  *See* Settlement Ag. [ECF 481-1], Ex. 2 (34 C.F.R. § 300.43(a)(1)) (transition services are designed to "facilitate the child's movement from school to post-school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation.").  For some ECMs,  the Settlement Administrator has concluded that the <u>only</u> way to provide full Services is to establish an SNT account.  Duffy Decl. ¶ 7.

On March 24, 2020, E.K., one of the Class lead Plaintiffs, submitted a request for approval of a disbursement to fund an SNT designed <u>only</u> for the purpose of accepting funds from the Services Fund.  Miller Decl. ¶ 19(a).  E.K.'s SNT expressly incorporates the Settlement Agreement by reference and defines Services that may be purchased using SNT funds to match those enumerated in the Settlement Agreement.  *Id.*  Once approved, this trust instrument will serve as a model for future SNTs; expenditures would therefore be expressly limited to Services and assistive technology covered under the Settlement Agreement.  *Id.* ¶ 19.

14

The Settlement Administrator approved the March 24, 2020 SNT recommendation for E.K.  Duffy Decl. ¶ 8.  After DOE filed this Motion, he agreed to withhold payment approval to the SNT pending adjudication of this Motion.  *Id.*

SNTs will be especially useful in the coming weeks and months, as the availability of Services and providers will inevitably and drastically change due to the COVID-19 pandemic.  Miller Decl. ¶ 20.  SNTs will provide a stable source of funding for the Services to which ECMs are entitled, even while the service landscape shifts.  If ECMs are deprived of Services now, SNTs will allow them to obtain those Services in the future, when they become available.  *Id.*

### H.    ABLE Accounts

Along similar lines, the Settlement Team also identified a potential option akin to SNTs called ABLE Accounts.  Miller Decl. ¶ 21.  ABLE Accounts[5] are tax-advantaged savings accounts that also can fund disability expenses without harming the beneficiary's eligibility for public benefits.  *Id.*  Although Hawaiʻi does not offer a State-sponsored ABLE Account, many states offer programs to out-of-state enrollees.  Miller Decl. ¶ 22.  As discussed during a recent status conference before the Court, Class counsel has been conferring with California's

---

[5] "ABLE" Accounts were established under the Stephen Beck Jr. Achieving a Better Life Experience Act of 2014 (26 U.S.C. § 529A).

CalABLE program that has offered to work with the Settlement Team to streamline enrollment for members of the Class who are interested in this potential option. *Id.*

The Settlement Team is prepared to establish ABLE Accounts for interested ECMs immediately, should this Motion be resolved in Plaintiffs' favor.   Miller Decl. ¶ 23.  The Settlement Team anticipates that ABLE Accounts will be an efficient way to disburse benefits to certain ECMs in Tiers 2 and 3, because the annual contribution limit is $15,000.[6] *Id.* ¶ 24.  For example, ABLE Accounts may be particularly helpful for incarcerated individuals, to whom the Settlement Team likely cannot deliver Services during the period of incarceration before  the December 31, 2020 settlement deadline.[7] *Id.*

## IV.   LEGAL ANALYSIS

DOE's Motion should be denied for numerous reasons.  First, as discussed above, FRCP Rule 65 is not the appropriate vehicle for the issues presented by the

---

[6] Tier 2 ECMs are entitled to up to $20,000; Tier 3 ECMs up to $5,000.

[7] As already noted, DOE offered to take the lead on delivering Services to incarcerated individuals.  Miller Decl. ¶ 25.  However, Class Counsel has little confidence in DOE's efforts, since to date, DOE has done nothing more than identify ECMs who are incarcerated and list services that are available to those ECMs as members of the general incarcerated population.  *Id.*  Moreover, DOE suggested at the last status conference before the Court that the dollar value of any services already provided to ECMs (which are available to all incarcerated individuals) should be subtracted from the ECM's entitlement under the Settlement Agreement.  *Id.*

Motion.  Second, even if this Court is willing to entertain DOE's request for injunctive relief, DOE cannot meet the standard required to obtain a preliminary injunction.  Third, payments for adaptive vehicle leases, SNTs, and ABLE accounts are all allowed under the Settlement Agreement.  Finally, to the extent that the <u>process</u> for making payments to SNTs and ABLE accounts is not contemplated under the Settlement Agreement, good cause exists to modify the process to allow both.

### A. There is No "Claim" Underlying DOE's Motion, So the Motion Must Fail

The Court's equitable power lies only over the merits of the case or controversy before it.  When a plaintiff seeks injunctive relief based on claims not pled in the complaint, a court does not have the authority to issue an injunction. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 637 (9th Cir. 2015).  A party must "establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."  *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).  Here, the parties settled the matter and dismissed the Complaint.  While this Court retained jurisdiction over all aspects of the Settlement Agreement, it does not have jurisdiction to issue a preliminary injunction and the Motion should be denied.

10109966\000001\114610526

**B.   DOE's Procedural Improprieties Aside, DOE Cannot Meet the Standard for Injunctive Relief**

To obtain preliminary injunctive relief, a movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Kaiser Found. Health Plan, Inc. v. Queen's Med. Ctr., Inc.*, 423 F. Supp. 3d 947, 951 (D. Haw. 2019) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "When a party 'has not shown any chance of success on the merits, no further determination of irreparable harm or balancing the hardships is necessary.'" *Id.* (citing *Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007)).  A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  The moving party "always has the burden on each element of the test." *Taylor-Failor v. Cty. of Haw.*, 90 F. Supp. 3d 1095, 1099 (D. Haw. 2015) (internal quotes and citation omitted).

DOE cannot meet any of the elements.

**1.   DOE Cannot Prevail on the Merits**

As discussed above, DOE has no claim, and no likelihood of success on the merits of any claim, nor is there a pending action for which DOE can seek "preliminary" relief.  Furthermore, as discussed *infra* Part IV.C, disbursements for

18

SNTs, ABLE Accounts, and adaptive vehicle leases are permitted under the Settlement Agreement.

### 2. There is No Irreparable Injury to DOE

DOE argues that if disbursements are made for SNTs, ABLE Accounts, or adaptive vehicle leases, DOE will be harmed immediately and irreparably because it will be impossible for DOE to "recover" the funds. ECF 560 p.20. This further demonstrates DOE's view that the Services Fund belongs to the State. It does not; it belongs to the Class.

The Settlement Agreement tasks the Settlement Administrator with maximizing "each ECM's timely receipt of the complement of educational and related services to which he/she is entitled." Settlement Ag. [ECF 486-1], Ex. 1 ¶ 1. This is because DOE irreparably harmed the Class by depriving its members of special education and related services, in violation of federal law. The Services Fund is an imperfect attempt to compensate and make whole ECMs whom DOE wronged. Under ideal conditions, the Settlement Administrator would disburse the entire Services Fund to the Class, with no remainder balance returning to DOE. *See id.* ¶ 6. Thus, payments to ECMs from the Services Fund established to compensate them for DOE's injury to them does not, and cannot, "harm" DOE.

Moreover, even if payments to the Class from the Services Fund could possibly be characterized as an injury to DOE, monetary harm is insufficient to

19

show "irreparable" harm supporting issuance of a preliminary injunction. *See, e.g., Sampson v. Murray*, 415 U.S. 61, 90 (1974).

### 3.     *The Balance of Equities Favors the Class*

The balance of the equities favors non-issuance of an injunction.  It is the Class, and not DOE, that will suffer injury if an injunction issues.  The settlement deadline is December 31, 2020.  This Motion interferes with the Settlement Administrator's obligation to maximize disbursements and jeopardizes each ECM's ability to benefit from the Service Fund.

### 4.     *Public Policy Favors the Class*

Finally, it should be clear that public policy favors Plaintiff Class.  The Services Fund was created to address the injuries inflicted on the ECMs by DOE.  The funds were appropriated by the State Legislature as a settlement after a seven-year-long fight with DOE.  Miller Decl. ¶ 12.  Public interest weighs heavily in favor of ensuring the Services Fund is disbursed to the injured parties and not the wrongdoer.  DOE's attempt to cast itself as the champion of the taxpayer, *see* ECF 560 p.24, is preposterous.  DOE mishandled taxpayer money by depriving the Class of Services, wasted resources by defending this Class action for years, and now seeks every opportunity to deprive the Class of its entitlements under the Settlement Agreement.  Returning money to DOE, and thereby rewarding its conduct, is not in the public interest.

10109966\000001\114610526

### C.    Disbursements Are within the Scope of the Settlement Agreement

Disbursements for SNTs, ABLE Accounts, and adaptive transportation

leases are within the scope of both the Settlement Agreement and the IDEA.  The

Settlement Agreement and the IDEA "encompass[] a broad definition of

'educational and related services'."  Settlement Ag. [ECF 486-1], Ex. 1, ¶ 2.c.

DOE urges this Court to adopt a narrow view of "Services" that contravenes the

purpose and intent of  the Settlement Agreement and the IDEA.

#### 1.    *Adaptive Vehicle Leases*

The Settlement Agreement provides payments for "Services" to ECMs.  *See*

*generally* Settlement Ag. [ECF 486-1] ¶ I.  "Services" means "special education

and related services."  *Id.*  Under the Settlement Agreement, "Services" include,

<u>but are not limited to</u>, "any . . . services that would be available to special

education eligible students under the IDEA."[8]  *Id.*

Under the IDEA, based on their disabilities, special education students may

be entitled to "transportation," which includes "[s]pecialized equipment (such as

special or adapted buses, lifts, and ramps), if required to provide special

transportation for a child with a disability."  *Id.* at Ex. 2 (34 C.F.R. § 300.34

(c)(16)(iii).  Hence, specialized equipment—including adapted buses, lifts, and

---

[8] As such, "Services" available under the Settlement Agreement may include even services that are not available under the IDEA, but fulfill a similar function in providing Services to ECMs who are now young adults outside a school setting.

21

ramps—are <u>expressly included</u> in the IDEA.  Nothing in the IDEA prohibits the provision of adaptive vehicles to children with disabilities, and DOE cites no authority stating that adaptive vehicles are disallowed under the IDEA.

The purpose of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  34 C.F.R. § 300.1.  L.H.'s case illustrates precisely why an adaptive vehicle lease can best meet this objective.  In order for L.H. to obtain any Services, L.H. requires adequate wheelchair-accessible transportation.  Miller Decl. ¶ 17.  Public transportation is inappropriate for L.H. for medical reasons.  *Id.*  Other available private forms of adaptive equipment (such as fold-up ramps) do not meet L.H.'s unique needs.  *Id.*  Thus, the Settlement Team has determined that an adaptive vehicle lease would best meet L.H.'s individual transportation needs, and the Settlement Administrator has announced his intent to approve that recommendation. Miller Decl. ¶ 17; Duffy Decl. ¶ 6.  Nothing in the IDEA or the Settlement Agreement prohibits the Settlement Administrator from approving this disbursement.

### 2.    *Special Needs Trusts and ABLE Accounts*

DOE contends that funding SNTs and ABLE Accounts is not allowed under

the Settlement Agreement, characterizing such funding as "monetary damages"

and a "cash payout". DOE argues that the funds could be "used to the benefit of

person's [*sic*] other than the ECM" or "be spent for purposes other than Services of

compensatory education." ECF 560 p.18. DOE is wrong for several reasons.

First, the Settlement Agreement does not prohibit the Settlement

Administrator from making payments to trusts or other accounts, so long as the

payments from those accounts are limited to providing for covered Services. *See*

*generally id.* On the contrary, it directs the Settlement Administrator to maximize

payments and contemplates coverage for past, current, and future Services. *See*

Settlement Ag. [ECF 486-1], Ex. 1 ¶¶ 1 (the goal of the Settlement Administrator

is to maximize entitlements), 2.b (contemplating reimbursement for payment of

past, current, and future services).

Second, the recommendation to approve E.K.'s March 24, 2020 request for

disbursement to E.K.'s SNT incorporates the Settlement Agreement by reference,

and therefore funds will only be spent on Services that comply with the terms of

the Settlement Agreement.[9] Miller Decl. ¶ 19; Duffy Decl. ¶ 7. While it is true

---

[9] The only exception is in the event of the E.K.'s death, in which case any remaining funds would be distributed to a not-for-profit of his choice. Miller Decl. ¶ 19(b). A plausible alternative could see remaining funds revert elsewhere (such

23

that the Settlement Administrator will not review and approve each expenditure out of the SNT, the SNT Trustee will review and approve payments under the same parameters as set forth under the Settlement Agreement.  Miller Decl. ¶ 18.  A similar limitation in the form of an affidavit will be in place to ensure that any funds disbursed into ABLE accounts will only be spent in compliance with the Settlement Agreement.  *Id.* ¶ 23.  Establishing accounts such as these has been determined by the Settlement Administrator to represent the *only* option to provide some ECMs with their full benefits by the applicable settlement deadline.  Duffy Decl. ¶¶ 7, 9.

> **D.   Even if the Settlement Agreement Does Not Contemplate a Procedure for Establishing SNTs and ABLE Accounts, Good Cause Exists to Modify the Disbursement Procedures**

To the extent that disbursements to SNTs and ABLE accounts are deemed not to follow the process for disbursement outlined in the Settlement Agreement, *see* Settlement Agreement [ECF 486-1], Ex. 1 ¶ 2.b.a.3 (treatment plan to be prepared by qualified service provider), the Settlement Agreement specifically

---

as to DOE), but DOE did not raise this issue with the Settlement Team at any time in the last year during which SNTs were discussed during status conferences before the Court or prior to filing the Motion, so the parties did not have an opportunity to negotiate alternative SNT language.  *Id.*  Similarly, to allay its alleged concerns, DOE could perform audits of expenditures made from SNTs and ABLE Accounts to ensure they are spent on eligible Services.  Again, because DOE refused to meaningfully engage in problem-solving these options when they were first proposed by Class Counsel approximately a year, this option has not been explored either.

states that the Court may modify the process "for good cause."  *See id*., Ex. 1 ¶ 2.b).  Good cause exists here.

Based upon two years of individualized and intensive work with ECMs and investigations into the Services available to them, Settlement Administrator Duffy has concluded that SNTs and ABLE Accounts may be the <u>only</u> option that will allow ECMs to obtain full benefits under the Settlement Agreement.  Duffy Decl. ¶¶ 7, 9.  Moreover, the need for SNTs and ABLE Accounts has now increased dramatically because of the COVID-19 pandemic.  With Services now suspended and indefinitely unavailable, SNTs and ABLE Accounts will ensure certain ECMs will receive the compensation guaranteed to them under the Settlement Agreement.

## V.      CONCLUSION

For the reasons set forth above, Plaintiffs request that the Court deny DOE's Motion for Preliminary Injunction.

DATED: Honolulu, Hawaiʻi, April 27, 2020.

 /s/ Janna Wehilani Ahu
PAUL ALSTON
KRISTIN L. HOLLAND
MEREDITH G. MILLER
ERIKA L. AMATORE
JANNA WEHILANI AHU

Attorneys for Plaintiffs

25